# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| IN RE CAMPING WORLD HOLDINGS, INC. STOCKHOLDER DERIVATIVE LITIGATION | ) ) ) ) ) | CONSOLIDATED C.A. No. 2019-0179-LWW |

## MEMORANDUM OPINION

Date Submitted: October 5, 2021
Date Decided: January 31, 2022

Martin S. Lessner, Emily V. Burton, and Kevin P. Rickert, YOUNG CONAWAY STARGATT & TAYLOR LLP, Wilmington, Delaware; Brian J. Robbins, Stephen J. Oddo, and Gregory E. Del Gaizo, ROBBINS LLP, San Diego, California; *Counsel for Plaintiffs Lincolnshire Police Pension Fund, Betsy M. Hunnewell, and Ira Sonet*

Gregory P. Williams and Matthew D. Perri, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Andrew B. Clubok, LATHAM & WATKINS LLP, Washington, D.C.; Eric R. Swibel, LATHAM & WATKINS LLP, Chicago, Illinois; *Counsel for Defendants Marcus A. Lemonis, Brent L. Moody, Stephen Adams, Andris A. Baltins, Brian P. Cassidy, Jeffrey A. Marcus, K. Dillon Schickli, Mary J. George, Howard A. Kosick, Thomas F. Wolfe, Roger L. Nuttall, Daniel G. Kilpatrick, Crestview Partners II GP, L.P., Crestview Advisors, L.LC., ML Acquisition Company, LLC, and Nominal Defendant Camping World Holdings, Inc.*

**WILL, Vice Chancellor**

Camping World Holding, Inc., led by entrepreneur and television personality Marcus Lemonis, is the country's leading dealer of recreational vehicles and related parts and supplies. In May 2017, Camping World won a bankruptcy auction for the assets of sporting goods retailer Gander Mountain Company. Camping World and Gander entered into an asset purchase agreement under which Gander stores would close with certain stores to be reopened by Camping World. Camping World's announcement of the deal explained that the precise locations and dates of those store re-openings were yet to be determined.

Camping World continued to provide updates on the Gander integration in public disclosures throughout 2018. These disclosures described, for instance, revised timelines for store openings and rising expenses. In February 2018, Lemonis described chaotic conditions he observed in one Gander distribution center. But the integration process continued and, by the end of September 2018, Camping World was operating 60 Gander stores.

While the process was of assimilating Gandar's assets was underway, Camping World conducted two secondary offerings—one in May 2017 and one in October 2017. An investment vehicle controlled by Lemonis and Crestview Advisors, LLC, which held a substantial stake in Camping World, each sold shares. At different times, officers of Camping World also sold shares under Rule 10b5-1 plans.

1

In this derivative action, stockholders of Camping World claim that those trades were made on the basis of material, non-public information about problems with the Gander integration. The plaintiffs also contend that Camping World's fiduciaries issued disclosures that painted an overly optimistic picture of the process despite knowing of complications. At the same time, the plaintiffs argue that Camping World's directors were left in the dark about the Gander acquisition and failed to oversee Lemonis's integration plan. The plaintiffs did not make a demand before seeking to pursue claims on Camping World's behalf. Each of the defendants has moved to dismiss the complaint.

The threshold issue in this case is whether the plaintiffs' failure to make a demand on Camping World's board should be excused. The plaintiffs advance several theories for demand futility, including that a majority of the board members are interested because they face a substantial likelihood of liability on the claims in this action and that certain directors lack independence from an interested party.

In this decision, I conclude that a majority of Camping World's nine-member board could exercise independent and disinterested judgment in responding to a demand. The defendants' motion to dismiss pursuant to Court of Chancery Rule 23.1 is granted and this action will be dismissed in its entirety.

## I. FACTUAL BACKGROUND

The following facts are drawn from the plaintiffs' Amended Verified Stockholder Derivative Complaint and the documents it incorporates by reference.[1] Any additional facts described are not subject to reasonable dispute or are subject to judicial notice.[2]

---

[1] Verified Am. Stockholder Derivative Compl. ("Compl.") (Dkt. 37). *See Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 818 (Del. 2013) ("[A] plaintiff may not reference certain documents outside the complaint and at the same time prevent the court from considering those documents' actual terms." (quoting *Fletcher Int'l, Ltd. v. ION Geophysical Corp.*, 2011 WL 1167088, at *3 n.17 (Del. Ch. Mar. 29, 2011))); *Freedman v. Adams*, 2012 WL 1345638, at *5 (Del. Ch. Mar. 30, 2012) ("When a plaintiff expressly refers to and heavily relies upon documents in her complaint, these documents are considered to be incorporated by reference into the complaint . . . ."), *aff'd*, 58 A.3d 414 (Del. 2013). The plaintiffs argue that certain documents cited by the defendants in moving to dismiss the Complaint, which were produced to the plaintiffs in response to a Section 220 demand, should not be deemed incorporated by reference. Pls.' Answering Br. 10-11 (Dkt. 55). But the parties entered into a confidentiality agreement with regard to the Section 220 production in which they agreed that "the complaint in any derivative lawsuit that the Stockholder files arising out of, relating to, involving, or in connection with the Demand, shall be deemed to incorporate by reference the entirety of the books and records of which inspection is permitted." Defs.' Opening Br. Ex. 42 ¶ 21 (Dkt. 30). The court therefore can appropriately consider those documents and declines to convert the defendants' motions to dismiss into motions for summary judgment, as the plaintiffs request. *See In re Fitbit, Inc. S'holder Deriv. Litig.*, 2018 WL 6587159, at *2 n.3 (Del. Ch. Dec. 14, 2018).

[2] *See, e.g.*, *In re Books–A–Million, Inc. S'holders Litig.*, 2016 WL 5874974, at *1 (Del. Ch. Oct. 10, 2016) (explaining that the court may take judicial notice of "facts that are not subject to reasonable dispute" (citing *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 170 (Del. 2006))); *Omnicare, Inc. v. NCS Healthcare, Inc.*, 809 A.2d 1163, 1167 n.3 (Del. Ch. 2002) ("The court may take judicial notice of facts publicly available in filings with the SEC.").

## A. Camping World's Growth and Business

Nominal defendant Camping World Holdings, Inc. (the "Company"), is a Delaware corporation that, through its subsidiaries, sells recreational vehicles and related products and services. The Company is led by defendant Marcus Lemonis, a businessperson and television personality best known for starring on CNBC's "The Profit."[3] Lemonis is the Company's Chief Executive Officer and Chairman.[4]

The Camping World brand launched in 1966, steadily grew, and was acquired in 1997 by defendant Stephen Adams through his company Good Sam Enterprises.[5] In 2006, Adams and Lemonis formed a joint venture between Camping World and FreedomRoads, LLC, a recreational vehicle dealership they had co-founded in 2003.[6]

Camping World and FreedomRoads were formally combined in 2011 under CWGS Enterprises LLC, creating "the largest RV dealer and parts and service provider in North America."[7] The Company operates all of its businesses through

---

[3] Compl. ¶ 2.

[4] *Id.* ¶ 17.

[5] *Id.* ¶ 2; see Camping World Holdings, Inc., Prospectus (Form 424B2), at 11, 198 (Oct. 11, 2016) ("October 2016 Prospectus").

[6] Compl. ¶ 2.

[7] *Id.* ¶¶ 2-3.

4

CWGS.[8]  Adams is the chairman of the board of directors of CWGS and a member of the Company's board of directors (the "Board").[9]

## B.  Camping World Goes Public.

The Company conducted its initial public offering of 11.3 million shares of Class A common stock in October 2016.[10]  Lemonis and Adams together controlled a majority of the Company's voting power following the IPO.[11]  The Company's next largest beneficial owner was defendant Crestview Advisors, LLC, which controlled roughly 36% of the Company's voting power.  Crestview and certain entities affiliated with Adams and Lemonis have voting agreements that allow them to designate members of the Company's Board based on certain stock ownership thresholds.[12]

---

[8] *Id.* ¶ 3 n.2.  Camping World, Inc. is the Company's affiliate that operates its retail stores and is a subsidiary of Good Sam.  *Id.* ¶ 41.  Good Sam is a subsidiary of CWGS.  *Id.*

[9] *Id.* ¶ 3.

[10] *Id.* ¶ 56.

[11] *Id.* ¶¶ 48, 191.  Adams and Lemonis are co-owners of ML Acquisition Company, LLC which controls 47% of the Company's vote through ownership of its Class B common stock and common units of CWGS.  *Id.* ¶¶ 3, 48-49.  Lemonis solely owns ML RV Group which controls 5% of the Company's vote through ownership of its Class C common stock.  *Id.* ¶¶ 48-49.

[12] *Id.* ¶¶ 49-53.

5

### C. Camping World Acquires Gander and Targets 70 Gander Store Openings.

In April 2017, Camping World won a bankruptcy auction for certain assets of outdoor sporting goods retailer Gander Mountain Company and boating and water sport equipment retailer Overton's, Inc.[13]  A subsidiary of the Company proceeded to negotiate an asset purchase agreement with Gander to acquire certain assets including inventory, intellectual property, and the right to assume certain real estate leases in exchange for roughly $38 million.[14]

On May 1, 2017, the Board met and was informed of the successful bid.  That same day, the Company announced the deal in a press release.  Lemonis was quoted as saying that the Company's agreement obligated it "to assume a minimum of seventeen leases" and would allow the Company to "operate stores and retain employees at a number to maximize profitability."[15]  Lemonis described the deal structure as providing "much flexibility" that would allow the Company "to refine the inventory selection and select only those stores which are profitable" or "have a clear path to profitability."[16]  The United States Bankruptcy Court for the District of

---

[13] *Id.* ¶¶ 57-58 (citing Camping World Holdings Inc., Current Report (Form 8-K) (May 8, 2017) ("May 2017 Form 8-K")).

[14] May 2017 Form 8-K at 1.

[15] Compl. ¶¶ 77-78.

[16] *Id.* ¶ 78.

Minnesota approved the agreement on May 4, 2017 and the parties signed the agreement the following day.[17]

On May 8, 2017, Camping World issued a Form 8-K and a press release about the planned acquisition, explaining that the asset purchase agreement gave Camping World the "right to designate any real estate leases for assignment"[18] and that the Company initially planned to open Gander stores that it believed had a "clear path to profitability."[19] The Company's press release explained that Gander's inventory would be liquidated, its existing stores would be closed, and that it "currently planned" to reopen about 70 Gander stores, with the precise dates and locations to be determined.[20]

## D. The May 2017 Secondary Offering

On May 26, 2017, the Company filed a prospectus for a secondary offering of its Class A common stock. The prospectus reiterated that Camping World's "goal [was] to operate 70 or more [Gander] locations."[21] But it also warned that "the expected re-opening and ongoing operation of Gander Mountain retail locations [wa]s subject to, among other things, the negotiation of lease terms with landlords

---

[17] Camping World Holdings, Inc., Prospectus (Form 424B2), at 6 (May 26, 2017) ("May 2017 Prospectus"); *see* Compl. ¶ 57.

[18] May 2017 Form 8-K at 1.

[19] Compl. ¶ 82.

[20] *Id.* ¶ 83.

[21] Compl. ¶¶ 85, 87 (quoting May 2017 Prospectus at 6).

on terms acceptable to [the Company] and approval of the Bankruptcy Court" and that the re-openings may not occur "within the time frame [the Company] anticipate[d] or at all."[22] The offering documents incorporated by reference Camping World's 2016 Form 10-K, which stated that the Company's disclosure controls "were effective at the reasonable assurance level" and that the financial information within the Form 10-K complied with generally accepted accounting principles ("GAAP").[23]

The secondary offering closed on May 31, 2017. The Company and Crestview sold 4 million and 5.5 million shares of Class A common stock, respectively, at a price of $27.25 per share. The Company's underwriters then exercised their right to purchase shares from Crestview, resulting in Crestview selling another 825,000 shares in a transaction that closed on June 9, 2017.[24]

**E.     Camping World Announces a Reduced Number of Expected Store Openings.**

On June 30, 2017, the Company issued a press release announcing that it had lowered the estimated number of store openings to "less than 70."[25] The release listed 57 stores that the Company intended to open "under the new Gander Outdoors

---

[22] May 2017 Prospectus at 55.

[23] Compl. ¶ 69; *see id.* ¶ 86.

[24] *Id.* ¶¶ 88, 163.

[25] *Id.* ¶ 90.

and Overton's brand."[26]  Lemonis was quoted as saying that the Company was opening fewer than the "original goal" of 70 stores because it was "not willing to open stores" that lack "a clear path to profitability."[27]

Lemonis provided additional details during an August 10, 2017 earnings call. He stated that "contingent on [its] final lease negotiations," the Company's "current plan" was to open an "initial 15 to 20 Gander stores by the end of 2017, another 15 to 20 stores in the first few months of 2018, and an additional 10 to 30 stores during the balance of 2018, with measured growth anticipated thereafter."[28]

## F.    The October 2017 Secondary Offering

On October 27, 2017, the Company filed a prospectus for another secondary offering of its Class A common stock.  Crestview sold 6.86 million shares and ML Acquisition (through which Adams and Lemonis held interests in the Company) sold 800,000 shares at a price of $40.50 per share on October 30, 2017 and November 1, 2017.[29]

The prospectus disclosed that Camping World planned to open an initial 15 to 20 Gander stores in the first quarter of 2018, rather than in 2017 as previously

---

[26] *Id.*

[27] *Id.*

[28] *Id.* ¶ 96.

[29] *Id.* ¶ 100.

announced.[30]  The offering documents also incorporated by reference the Company's

2016 Form 10-K and other quarterly filings and stated that the Company's financial

statements were prepared in accordance with GAAP.[31]

**G.  Camping World Targets Sixty Gander Store Openings by May 2018.**

On December 5, 2017, the Board was provided with a preliminary plan for

opening Gander store locations.  The plan, which was based on November 27, 2017

projections, included a goal of opening a total of 60 stores by May 9, 2018 and one

more by the end of the year.  One store was expected to open by the end of 2017.

By the end of December 2017, the Company had opened its first two Gander Outdoor

stores.[32]

The Board was given an final plan on January 4, 2018.  The plan was based

on the same November 27, 2017 projections as the preliminary plan previously

distributed to the Board and contained the same estimates for store openings.[33]

Also on January 4, 2018, the Company announced that it planned to open 69

Gander stores by the end of May 2018.  Lemonis explained that Camping World's

---

[30] Camping World Holdings, Inc., Prospectus (Form 424B2), at 56 (Oct. 27, 2017) ("October 2017 Prospectus").

[31] Compl. ¶¶ 101-02.

[32] *Id.* ¶¶ 114-16; Defs.' Opening Br. Ex. 25 at 19-20 ("2018 Preliminary Plan") (Dkt. 50).

[33] Compl. ¶ 116; Defs.' Opening Br. Ex. 28 at 19-20 ("2018 Plan").

team had been "working tirelessly over the past 6 months to get the locations prepared" and that he "hope[d] to open all locations" by the spring.[34]

### H. The Company Announces Revisions to Its 2016 Financial Statements

While preparing the Company's 2017 financial statements, defendant Thomas Wolfe—then the Company's Chief Financial Officer—and the Company's external auditor discovered accounting errors in the Company's 2016 financial statements.[35] On February 22, 2018, Wolfe informed the Board about the errors and explained that adjustments to the Company's financial statements would be made.[36]

On February 27, 2018, Camping World disclosed that certain revisions had been recorded to "correct for errors that were immaterial to [its] previously-reported consolidated financial statements."[37] The Company also explained that the forward looking statements in its announcement involved factors including the "potential impact of the recently identified material weaknesses in [its] internal control over

---

[34] Compl. ¶ 117.

[35] *Id.* ¶¶ 111, 124.

[36] *Id.* ¶ 119.

[37] Camping World Holdings Inc., Current Report (Form 8-K) Ex. 99.1 (Feb. 27, 2018). The errors related to: "i) the lack of deferral of a portion of Good Sam roadside assistance policies sold through the finance and insurance process with the sale of new and used vehicles, ii) the application of a portion of certain vendor rebates against the related inventory balances, iii) the elimination of the intercompany allocation of certain revenue from new and used vehicles to consumer services and plans, and iv) the allocation of the intercompany markup between costs applicable to new and used vehicles." *Id.*

11

financial reporting."[38]  The Company's corrected results led to a reduction in 2016 earnings per share from 11 cents per share to 8 cents per share and a reduction in the Company's fourth quarter 2016 net income from $13.6 million to $11.5 million.[39]

That same day, the Company held an earnings call with analysts and investors. Lemonis stated that the "early trends in [the opened Gander stores] ha[d] been very promising."[40]  He noted that Camping World expected Gander stores "to be a drag on the adjusted EBITDA in the first half of the year" but "accretive in the second half."[41]  He also explained that 11 Gander Outdoor branded stores were "up and running" and that the Company expected to open "nearly 72" stores by June 2018.[42]

## I.    Sixty Gander Stores Open by September 2018

The opening of Gander stores continued to run behind schedule through the spring of 2018, causing revenue and EBITDA to fall below expectations.  The Company issued a press release on May 8, 2018 reporting its quarterly financial results and disclosing that the Company's adjusted EBITDA margin had decreased from 8.2% to 6.8% and that SG&A expenses had increased 39.7% year-over-year.[43]

---

[38] *Id.*

[39] Compl. ¶ 125.

[40] *Id.* ¶ 126 (quoting Defs.' Opening Br. Ex. 30 at 3-4 ("Q4 2017 Earnings Call")).

[41] *Id.* (quoting Q4 2017 Earnings Call at 4).

[42] *Id.* ¶ 128 (quoting Q4 2017 Earnings Call at 3).

[43] *Id.* ¶ 143.

12

On the associated earnings call, Wolfe stated that "adjusted EBITDA for the outdoor stores for the first quarter was about [an] $8.9 million loss."[44]

Lemonis announced during the call that 42 Gander stores had been opened.[45] He described "challenges on several fronts" that had caused the stores to "open[] a little later than . . . anticipated."[46] Those "challenges" included "IT infrastructure, inventory management and distributions systems."[47] Lemonis explained that Camping World was rebuilding distribution centers "from scratch," and highlighted a visit to a distribution center in Lebanon, Indiana where "hundreds of thousands of new SKUs" and "thousands of new" products were being added to a "brand-new operating system," which he described as "a giant shit show."[48] He said that those problems led to "the decision to slow down the operating process" so that stores were opening "right the first time."[49]

Lemonis also noted that Gander's effect on Camping World's second quarter 2018 adjusted EBITDA would be "significantly more" than the $8.9 million loss in the first quarter and agreed that the Gander could "possibly cause [the Company] to

---

[44] *Id.* ¶ 144 (quoting Defs.' Opening Br. Ex. 33 at 11 ("Q1 2018 Earnings Call")).

[45] The Company ultimately opened 52 Gander stores by the end of May 2018. *Id.* ¶ 129.

[46] *Id.* ¶ 146 (quoting Q1 2018 Earnings Call at 3).

[47] Q1 2018 Earnings Call at 3.

[48] Compl. ¶ 147.

[49] *Id.*

alter [its] outlook."[50]  Ultimately, the Company's second quarter adjusted EBITDA came in 9% below guidance, leading Camping World to lower its guidance for 2018.[51]  Lemonis disclosed during an August 7, 2018 earnings call that the Company's EBITDA for the fiscal year 2018 would be between $370 and $380 million, below its prior guidance of $431 to $441 million.[52]  The Company's stock price dropped 14% following the announcement.[53]

By the end of September 2018, 60 Gander Outdoor branded stores had opened.[54]

### J.  Procedural History

On March 5, 2019, plaintiffs Betsy M. Hunnewell and Ira Sonet filed a Verified Stockholder Derivative Complaint in this court.[55]  On April 12, 2019, following the receipt of documents in response to a Section 220 demand, plaintiff Lincolnshire Police Pension Fund filed a separate Verified Stockholder Derivative Complaint for Breach of Fiduciary Duty and Unjust Enrichment.[56]  On May 30, 2019, Chancellor Bouchard granted an order consolidating the two actions and

---

[50] Q1 2018 Earnings Call at 14; *see* Compl. ¶ 144.

[51] Compl. ¶ 157.

[52] *Id.*

[53] *Id.* ¶ 158.

[54] Defs.' Opening Br. Ex. 40 at 6.

[55] Dkt. 1.

[56] C.A. No. 2019-0285-AGB, Dkt. 1.

staying them pending the resolution of a related federal action in the United States District Court for the Northern District of Illinois.[57] On August 5, 2020, the federal district court granted a motion approving a settlement and entered an order dismissing the federal action with prejudice.[58]

On January 8, 2021, the plaintiffs in this consolidated action filed an Amended Verified Stockholder Derivative Complaint for Breach of Fiduciary Duty and Unjust Enrichment (the "Complaint").[59] The Complaint advances two counts derivatively on behalf of Camping World.[60] Count I is asserted against each of the individual defendants for breaching their fiduciary duties. It includes a claim against certain directors and officers under *Brophy v. Cities Services Company*[61] for "selling Camping World stock on the basis of the knowledge of improper information . . . before that information was revealed to the Company's stockholders."[62] The plaintiffs maintain that Count I also includes claims for making, allowing, or causing the Company to make false and misleading statements, and an oversight claim for "fail[ing] to prevent" certain individual defendants from "taking . . . illegal

---

[57] Dkt. 17; *see Ronge v. Camping World Hldgs., Inc.*, No. 1:18-cv-07030 (N.D. Ill.).

[58] *See* Dkt. 26.

[59] Dkt. 37.

[60] Compl. ¶¶ 197-207.

[61] 70 A.2d 5 (Del. Ch. 1949).

[62] Compl. ¶ 200.

15

actions."[63]  Count II is asserted against all of the defendants for unjust enrichment as a result of "compensation and director remuneration" or profits from allegedly selling Camping World stock while in possession of material non-public information."[64]

The defendants filed a motion to dismiss on March 8, 2021.[65]  Briefing on the motion was completed on July 23, 2021.[66]  I heard oral argument on the motion on October 5, 2021.[67]

## II.    LEGAL ANALYSIS

The individual defendants and Camping World have moved to dismiss the Complaint under Court of Chancery Rule 23.1 for failure to plead demand futility and under Court of Chancery Rule 12(b)(6) for failure to state a claim upon which relief can be granted.  For the reasons explained below, I conclude that demand was not excused. The Complaint is therefore dismissed under Rule 23.1.

### A.    The Legal Standard for Demand Excusal

"The decision whether to initiate or pursue a lawsuit on behalf of the corporation is generally within the power and responsibility of the board of

---

[63] *Id.* ¶¶ 36-37.  These aspects of Count I are not specified within the count itself.
[64] *Id.* ¶¶ 203-07.
[65] Dkt. 47.
[66] Dkt. 59.
[67] Dkt. 72.

16

directors."[68] A stockholder plaintiff may pursue claims on a corporation's behalf "if (1) the corporation's directors wrongfully refused a demand to authorize the corporation to bring the suit or (2) a demand would have been futile because the directors were incapable of impartially considering the demand."[69] Because the plaintiffs did not make a demand on the Board, they must show why doing so would have been futile.

The Delaware Supreme Court established a three-part, "universal test" for assessing demand futility in *United Food & Commercial Workers Union v. Zuckerberg*.[70] The test is "consistent with and enhances" the standards articulated in *Aronson*, *Rales*, and their progeny, which "remain good law."[71] Under *Zuckerberg*, the court must consider, director-by-director:

> (i) whether the director received a material personal benefit from the alleged misconduct that is the subject of the litigation demand;
>
> (ii) whether the director faces a substantial likelihood of liability on any of the claims that would be the subject of the litigation demand; and
>
> (iii) whether the director lacks independence from someone who received a material personal benefit from the alleged misconduct that would be the subject of the litigation demand or who would face a

---

[68] *In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 120 (Del. Ch. 2009) (citing 8 *Del. C*. § 141(a)).

[69] *Firemen's Ret. Sys. of St. Louis on behalf of Marriott Int'l, Inc. v. Sorenson*, 2021 WL 4593777, at *6 (Del. Ch. Oct. 5, 2021).

[70] 262 A.3d 1034, 1058 (Del. 2021).

[71] *Id.* at 1059.

substantial likelihood of liability on any of the claims that are the subject of the litigation demand.[72]

Demand is excused as futile if "the answer to any of the questions is 'yes' for at least half of the members of the demand board."[73] The "analysis is conducted on a claim-by-claim basis."[74]

In conducting this analysis, "[t]he court is confined to the well-pleaded allegations in the Complaint, the documents incorporated into the Complaint by reference, and facts subject to judicial notice."[75] Plaintiffs who forgo making a demand must "comply with stringent requirements of factual particularity" when alleging demand futility. "Rule 23.1 is not satisfied by conclusory statements or mere notice pleading."[76] Instead, "[w]hat the pleader must set forth are particularized factual statements that are essential to the claim."[77] The court draws "all reasonable factual inferences that logically flow from the particularized facts alleged."[78]

---

[72] *Id.*

[73] *Id.*

[74] *Beam v. Stewart*, 833 A.2d 961, 977 (Del. Ch. 2003).

[75] *In re Kraft Heinz Co. Deriv. Litig.*, 2021 WL 6012632, at *4 (Del. Ch. Dec. 15, 2021).

[76] *Brehm v. Eisner*, 746 A.2d 244, 254 (Del. 2000).

[77] *Id.* at 255.

[78] *Id.*

18

## B.     The Demand Futility Analysis in This Case

"The court 'counts heads' of the members of a board to determine whether a majority of its members are disinterested and independent for demand futility purposes."[79]  The Board in place when this litigation was originally filed on March 5, 2019 had nine members, each of whom is named as defendants in this action: (1) Lemonis; (2) Brent L. Moody, the Company's President; (3) Adams; (4) Andris A. Baltins; (5) Brian P. Cassidy, a Crestview partner; (6) Jeffrey A. Marcus, a Crestview partner; (7) K. Dillon Schickli; (8) Mary J. George; and (9) Howard A. Kosick.  This decision refers to those nine directors as the "Demand Board."  The plaintiffs attempt to establish demand futility by arguing (1) that the Demand Board members are not disinterested because they face a substantial likelihood of liability and (2) that certain Demand Board members also lack independence from other purportedly interested parties.

The plaintiffs first contend that defendants Lemonis, Adams, Marcus, Cassidy, and Moody face a substantial likelihood of liability based on sales of the Company's stock while they were in possession of material, non-public information. Only Moody is alleged to have personally traded stock (through Rule 10b5-1 plans).

---

[79] *In re Zimmer Biomet Hldgs., Inc. Deriv. Litig.*, 2021 WL 3779155, at *10 (Del. Ch. Aug. 25, 2021); *see Braddock v. Zimmerman*, 906 A.2d 776, 785-86 (Del. 2006).

19

The other challenged trades were by ML Acquisition and Crestview in the secondary offerings, and in a subsequent sale by ML Acquisition.

The plaintiffs also argue that the members of the Demand Board face a substantial likelihood of liability for making or approving misleading disclosures and for disregarding their oversight duties. "To establish a substantial likelihood of liability at the pleading stage, a plaintiff must 'make a threshold showing, through the allegation of particularized facts, that their claims have some merit.'"[80] Because the Company's certificate of incorporation contains a provision exculpating its directors for breaches of the duty of care, as permitted under 8 *Del. C.* § 102(b)(7), "the plaintiff[ ] must plead with particularity facts that support a meritorious claim for breach of the duty of loyalty."[81]

The plaintiffs' allegations about Lemonis are, by far, the most detailed and perhaps come closest to reaching the particularity threshold.[82] But, given that he is just one of nine Demand Board members, I decline to address whether he faces a substantial likelihood of liability since it would be superfluous. Because the defendants concede that Adams lacks independence from Lemonis, I also do not

---

[80] *In re TrueCar, Inc. S'holder Deriv. Litig.*, 2020 WL 5816761, at *12 (Del. Ch. Sept. 30, 2020) (quoting *Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1993)).

[81] *Zimmer Biomet*, 2021 WL 3779155, at *12; *see Zuckerberg*, 262 A.3d at 1049-57.

[82] This statement should not be understood to mean that any such allegations establish a substantial likelihood of liability against Lemonis.

address whether Adams faces a substantial likelihood of liability. An analysis of whether Moody (an officer) faces a substantial likelihood of liability is likewise unnecessary. My substantial likelihood of liability analysis is limited to the six outside members of the Demand Board. I conclude that none of those directors—Cassidy, Marcus, Schickli, Baltins, George, or Kosick—face a substantial likelihood of liability on any of the plaintiffs' claims.[83]

The plaintiffs next assert that two of those six outside Demand Board members—Baltins and Schickli—could not impartially consider a demand because they lack independence from Lemonis or Adams. I conclude that at least Schickli is independent.

As a result, the plaintiffs have failed to establish that five of the nine Demand Board members—Cassidy, Marcus, Schickli, George, and Kosick—could not impartially consider a demand. Demand is therefore not futile.

---

[83] The plaintiffs' unjust enrichment claim necessarily rests upon whether the directors face a substantial likelihood of liability on the *Brophy* claim. *See Fitbit*, 2019 WL 190933, at *4 n.26 ("[T]he public policy underlying a *Brophy* claim is to prevent unjust enrichment based on the misuse of confidential corporate information."). Regarding Count II, the Complaint states that the defendants "profited from breaches of fiduciary duty and were unjustly enriched through their exploitation of material and adverse inside information." Compl. ¶ 205. Moreover, the plaintiffs acknowledge that the "unjust enrichment claim is premised on the same allegations [as the *Brophy* claim]." Pls.' Answering Br. at 32. My demand futility analysis therefore addresses the *Brophy*, disclosure, and *Caremark* claims arguably encompassed within Count I.

### 1. The *Brophy* Claim

The plaintiffs argue that Lemonis, Adams, Marcus, Cassidy, and Moody face a substantial likelihood of liability for breach of the duty of loyalty based on sales of the Company's stock by the defendants or entities under their control while the defendants were in possession of material, non-public information ("MNPI").[84] "This type of claim is a state version of a federal insider trading claim and has its origins in Delaware law in the venerable case of *Brophy v. Cities Service Co.*"[85]

The Complaint alleges multiple sales of Company stock by different defendants at different points in time. Moody entered into 10b5-1 trading plans to sell his stock at several points in 2017.[86] ML Acquisition (owned by Adams and Lemonis) sold shares of Company stock through the 2017 secondary offerings and privately in 2018.[87] Crestview sold Company stock in the 2017 secondary offerings.[88]

---

[84] Compl. ¶ 174; Pls.' Answering Br. 1, 13-34.

[85] *In re Oracle Corp. Deriv. Litig.*, 867 A.2d 904, 925 (Del. Ch. 2004); *see Brophy v. Cities Serv. Co.*, 70 A.2d 5 (Del. Ch. 1949).

[86] Compl. ¶¶ 97, 163.

[87] *Id.* ¶¶ 88, 100, 135.

[88] *Id.* ¶¶ 85-88, 100; *see supra* Part I.D, Part I.F.

As discussed above, my analysis of whether the Demand Board members face a substantial likelihood of liability excludes Lemonis, Adams, and Moody.[89] The challenged trades by ML Acquisition and Moody are therefore not addressed in this decision.

Regarding Crestview's trades, the plaintiffs argue that Crestview's representatives on the Board—Cassidy and Marcus—can be held liable under *Brophy* even though they did not personally sell shares, citing to this court's decision in *In re TrueCar, Inc. Stockholder Derivative Litigation*.[90] In *TrueCar*, a fund's stock sales were attributable to a director who shared "voting and dispositive power" as one of four members of the fund's investment committee.[91] Here, Cassidy and Marcus are both Crestview partners and each a member of the ten-person investment committee responsible for Crestview's trading decisions.[92] Having one vote out of ten is not, by itself, an obvious indication of control. The question becomes a closer call—and more like the facts in *TrueCar*—if Marcus and Cassidy are viewed together as representing one-fifth of the vote over Crestview's investment

---

[89] To reiterate, by not conducting an analysis of the claims against Lemonis, Adams, and Moody, it should not be understood that the court has concluded that those individuals face a substantial likelihood of liability.

[90] 2020 WL 5816761.

[91] *Id.* at *10.

[92] Compl. ¶¶ 21-22, 30, 174; Defs.' Opening Br. Ex. 2 at CW-LPPF0003252.

decisions.[93]  But even if the court were to draw a pleading stage inference that Cassidy and Marcus exercised some authority over and profited from Crestview's sales, neither individual would face a substantial likelihood of liability.  The elements of a *Brophy* claim have not been adequately pleaded against them.

"[O]ur law sets the bar for stating a claim for breach of fiduciary duty based on insider trading very high."[94]  To state a claim under *Brophy*, a plaintiff must sufficiently plead that the defendants "1) possessed material, nonpublic company information; and 2) . . . used that information improperly by making trades because [they] was motivated, in whole or in part, by the substance of that information."[95] "[I]t must be shown that each sale by each individual defendant was entered into and completed on the basis of, and because of, adverse material non-public information."[96]  I address each element in turn.

[93] *See Fitbit*, 2018 WL 6587159, at *14 (finding that two directors who "share[d] voting and dispositive power over . . . stock owned by their respective funds" exercised control for purposes of potential *Brophy* liability).

[94] *In re Clovis Oncology, Inc. Deriv. Litig.*, 2019 WL 4850188, at *15 (Del. Ch. Oct. 1, 2019); *see Tuckman v. Aerosonic Corp.*, 1982 WL 17810, at *11 (Del. Ch. May 20, 1982) ("[C]orporate officers and directors may purchase and sell the corporation's stock at will, without any liability to the corporation.").

[95] *Oracle*, 867 A.2d at 934; *see also Guttman v. Huang*, 823 A.2d 492, 505 (Del. Ch. 2003).

[96] *Stepak v. Ross*, 1985 WL 21137, at *5 (Del. Ch. Sept. 5, 1985).

### a.     Possession of MNPI

The plaintiffs allege that Marcus and Cassidy possessed MNPI about Gander when Crestview's trades occurred.  The bulk of the allegations in the Complaint about alleged MNPI, however, center on Lemonis—particularly his colorful description of the chaos he observed during a visit to a Gander distribution center in Indiana.[97]  Those statements were made publicly on May 8, 2018—many months after the challenged trades were executed—and there are no particularized allegations establishing when Lemonis's site visit occurred.  Nor is there reason to impute Lemonis's knowledge to Marcus or Cassidy.

The allegations about Marcus and Cassidy center on what they learned about the Gander integration during Board meetings.  The plaintiffs contend that the Board was given non-public information that painted a "dire picture of the integration efforts."[98]  But there are no particularized facts in the Complaint supporting a rational inference that Marcus or Cassidy possessed adverse information about Gander that was materially different than that in the marketplace at the time of Crestview's trades.

"For information to be material, there must be a 'substantial likelihood' that the nonpublic fact 'would have assumed actual significance in the deliberations' of

---

[97] *See* Compl. ¶¶ 143-50.

[98] *Id.* ¶ 99.

a person deciding whether to buy, sell, vote, or tender stock."[99]  That is, had the information been disclosed, it would have "significantly altered the 'total mix' of information in the marketplace."[100]    An assessment of materiality requires that the court view the context of the supposedly material information, including the information that was known to the market.[101]  As discussed below, Crestview's trades followed public disclosures of information.[102]  The Complaint's description of undisclosed information known by Marcus and Cassidy rests on conclusory allegations and generalizations that cannot support a finding of materiality.

i.    Sales in the May 2017 secondary offering

The first set of challenged trades are Crestview's May 31 and June 9, 2017 sales in the May 2017 secondary offering.[103]  At that time, Camping World had disclosed its successful bid for Gander's assets and its "current goal" of operating about 70 Gander locations.[104]  The plaintiffs cite to May 8 and May 16, 2017 Board minutes and materials that they claim demonstrate the Company had no plan to operate 70 Gander stores—or to open any stores.  Presumably, the plaintiffs' point

---

[99] *Oracle*, 867 A.2d at 934 (quoting *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del.1985)).

[100] *Id.* (quoting *Rosenblatt*, 493 A.2d at 944).

[101] *Id.*

[102] *See Guttman*, 823 A.2d at 503-04.

[103] Compl ¶ 88.

[104] *See supra* Part I.C; Compl. ¶¶ 81-85, 87.

is that the lack of a concrete plan to open 70 stores is information the market would have found significant.[105] The allegations in the Complaint are inconsistent with that theory. The plaintiffs allege that the Board minutes and materials for those meetings show that the Board discussed "the status of the purchase of certain assets of Gander," "[m]erchandizing," "strategic opportunities generally resulting from [the] acquisition," and "[i]nventory levels, rent for real property, and corporate overhead."[106] Perhaps the Company's plan to open and operate Gander stores was incomplete or imperfect. But it cannot be reasonably inferred that the Company had no plan whatsoever.[107]

Moreover, the Company was upfront about the reality that it might not operate 70 stores and that its plans were subject to change. The Company disclosed on May 8, 2017 that it had only committed to take on 17 of Gander's real estate leases and had until October 6, 2017 to determine which additional leases it would assume.[108] The Company also explained in the May 2017 prospectus that its then-"current goal"

---

[105] In their brief, the plaintiffs take a different approach and argue that the Board knew the integration plan was going poorly. *See* Pls.' Answering Br. 24 n.14. That is not the story alleged in the Complaint. And, regardless, the allegations in the Complaint about the May 2017 Board minutes do not indicate that the integration—which had just begun—was not proceeding as expected.

[106] Compl. ¶¶ 81, 83.

[107] The plaintiffs make a similar argument about the lack of a plan to open stores with regard to the directors' knowledge at the time of Crestview's sales in the October 2017 secondary offering. It is equally deficient in that time period.

[108] May 2017 8-K at 1.

to operate 70 or more retail locations was subject to "among other things, the negotiation of lease terms with landlords on terms acceptable to us and approval of the Bankruptcy Court."[109]  In other words, the fact that the Company was still developing a plan for the number of Gander stores it might ultimately open was already known to the market before Crestview traded in the May 2017 secondary offering.

ii.     Sales in the October 2017 secondary offering

The second set of challenged trades are Crestview's October 30 and November 1, 2017 sales in the October 2017 secondary offering.[110]  The plaintiffs ask the court to infer that Marcus and Cassidy knew, by the time of the trades, that Gander stores would not open on the publicly announced timeline and that the Company's expenses from the integration were rising.

The Complaint provides that on August 9, 2017, the Company's Board was given a monthly update report stating that the Company expected 13 retail stores to open by the end of 2017.[111]  The plaintiffs also assert that during a Board meeting on September 28, 2017, the directors were given materials indicating that "the Company had only identified opening dates for three additional Camping World

---

[109] May 2017 Prospectus at 54-55.

[110] Compl. ¶ 163.

[111] Id. ¶ 94.

28

retail locations."[112]  The Board was also allegedly informed of large increases in the Company's year-over-year SG&A expenses at that meeting.

This information cannot reasonably be considered MNPI.  Before the October 2017 secondary offering, the market knew that the earlier plan for Gander store openings was delayed and that SG&A expenses were rising.  The Company's October 2017 prospectus stated that "[c]ontingent on [the Company's] final lease negotiations," the Company would not open the initial 15 to 20 Gander stores in 2017 (as previously announced) but "by the end of the first quarter of 2018" with "another 40 to 45 stores" to open later in 2018.[113]  The increase in SG&A expenses and the Company's expectation to "incur meaningful incremental expenses" because of the Gander integration were also disclosed in the August 10, 2017 earnings call and again in the October 2017 prospectus.[114]

The plaintiffs make much of the fact that the Board decided on September 28, 2017 that it would visit a Gander facility in person, arguing that the inference to be drawn is that the Board made that decision after receiving troubling information.[115] The plaintiffs ask the court to futher assume that the Board observed a disaster during

---

[112] *Id.* ¶ 99.

[113] October 2017 Prospectus at 7.

[114] Defs.' Opening Br. Ex. 17 at 3-4 ("Q2 2017 Earnings Call"); October 2017 Prospectus at 21, 83-84.

[115] Pls.' Answering Br. 24; *see* Compl. ¶ 99.

29

that visit given how Lemonis portrayed his own visit to a Gander facility.[116] Reasonable inferences cannot, however, be drawn from conjecture. Lemonis's tumultuous visit to Gander's Lebonon, Indiana distribution center at an unspecified time does not have any apparent ties to the Board's site visit (assuming that one even occurred). This dearth of well-pleaded allegations is fatal to the plaintiffs' argument that Crestview's trades were prompted by Marcus or Cassidy's non-public knowledge of major issues with the integration process.

### iii. General Arguments about MNPI

The plaintiffs maintain that the court can draw the general inference that Marcus and Cassidy "knew of problems at Gander" because the Board regularly received some level of non-public information about Gander store openings, inventory levels, corporate overhead, and personnel matters at regularly scheduled meetings.[117] In essence, the plaintiffs ask the court to assume that the information provided to the directors must have been materially adverse. This court will not

---

[116] *See* Pls.' Answering Br. 24 ("Lemonis's statements about what he saw when visiting a Gander facility foretell what the Board also saw, 'a giant shit show', further supporting that the Selling Defendants knew and traded on the basis of MNPI.").

[117] *Id.* at 18 n.11; *see* Compl. ¶¶ 73-74, 77, 81, 83-84, 89, 91, 93-94, 98-99, 106, 112-16, 119-21, 136-37.

credit conclusory allegations that the defendants "must have obtained some additional, material nonpublic information" because of their roles as fiduciaries.[118]

The plaintiffs' allegations about rising SG&A expenses and the precise number of stores that would open at certain points in time come closest to meeting the particularity threshold. As discussed above, the Company made the rising SG&A expenses public before Crestview traded and informed the public that Gander stores were opening later than planned.

The plaintiffs have not shown that the differences between the number of stores the Board believed would open compared to the figures given to the public meet the definition of materiality. For example, whether 60 or 70 Gander stores would open in 2018 does not reflect a "substantial likelihood" of an "extreme departure" from the Company's public statements about anticipated store openings.[119] The Company had consistently announced that the number of stores to be opened, and the timing of those openings, was not set but subject to many factors.[120]

---

[118] *Tilden v. Cunningham*, 2018 WL 5307706, at *19 (Del. Ch. Oct. 26, 2018); *see also Rattner v. Bidzos*, 2003 WL 22284323, at *11 (Del. Ch. Sept. 20, 2003).

[119] *Oracle*, 867 A.2d at 939-40.

[120] *See* May 2017 Form 8-K at 1; May 2017 Prospectus at 6, 55; October 2017 Prospectus at 7, 34, 56-57.

31

The vague allegations here bear little resemblance to cases cited by the plaintiffs where the court has drawn an inference that directors possessed MNPI. In *In re Fitbit, Inc. Stockholder Derivative Litigation*, for example, the court found that fiduciaries' knowledge of MNPI about the "scope and severity" of problems with a medical device could be inferred where they were given internal documents discussing the product's significant design flaws while the company was making bullish public statements about the product.[121] In *Louisiana Police Retirement System v. Pyott*, the court inferred that the board "knowingly approved and substantially oversaw a business plan that required illegal off-label marketing and support initiatives" for a medication where an internal presentation specified that pursuing unapproved uses was a "Top Corporate Priorit[y]."[122] In *Macomb County Employees' Retirement System v. McBride*, the court held that the plaintiff had pleaded particularized facts supporting an inference that the defendants possessed MNPI where the board knew that the company's primary revenue stream would be "imperil[ed]" based on a board presentation that "specifically contemplated" the company's "unsustainable" plot eventually being "foiled."[123]

---

[121] 2018 WL 6587159, at *7.

[122] 46 A.3d 313, 353, 356 (Del. Ch. 2012), *rev'd sub nom Pyott v. La. Mun. Police Emps.' Ret. Sys.*, 74 A.3d 612 (Del. 2013).

[123] C.A. No. 2019-0658-AGC, at 16 (Del. Ch. Mar. 9, 2021) (TRANSCRIPT).

Nothing of the sort is alleged here. The Complaint's conclusory allegations are more akin to those in *TrueCar*, where the plaintiffs alleged that the board had non-public information that a website redesign would negatively affect the company's business.[124] Because the complaint's description of information given to the board was vague, "susceptible to multiple interpretations," and gave no indication that the company's sales would be materially impaired, the court concluded that the plaintiffs failed to meet their pleading burden.[125] The plaintiffs in this case have similarly failed to demonstrate that Cassidy or Marcus possessed material information that the market lacked at the time of the trades.

### b. Scienter

The second element of *Brophy* requires that a plaintiff sufficiently plead that a fiduciary made trades based, at least in part, on the MNPI she possessed.[126] In other words, a successful insider trading claim requires a showing that the selling defendants acted with scienter, which must be alleged for each sale by each defendant.[127] Because the plaintiffs have failed to plead that Marcus or Cassidy

---

[124] 2020 WL 5816761, at *13-16.

[125] *Id.*

[126] *Fitbit*, 2018 WL 6587159, at *12; *Guttman*, 823 A.2d at 505.

[127] *TrueCar*, 2020 WL 5816761, at *25.

possessed MNPI at the time of Crestview's trades, they cannot show that those trades were motivated by the substance of that information.[128]

Any inference that Crestview's trading decisions were completed on the basis of Marcus or Cassidy's superior information is further undercut by the timing of the trades. Crestview's May 31 and June 9, 2017 trades followed the Company's May 4 and 26, 2017 disclosures that it lacked an exact schedule for which stores would open and when.[129] Crestview's October 30 and November 1, 2017 trades followed the Company's August 10, 2017 disclosure that uncertainty remained about the number of store openings and that SG&A expenses had increased and been affected by Gander.[130] And the October 2017 prospectus announced that the initial 15 to 20 store openings were delayed until 2018.[131]

In *Guttman v. Huang*, the court observed that trades made after a public announcement refuted an inference of wrongdoing because they are "more obviously consistent with the idea that [the Company] permitted stock sales in such periods

---

[128] *Id.* at \*26 (rejecting the argument that directors faced a substantial likelihood of liability for a *Brophy* claim where the plaintiffs failed to allege particularized facts supporting an inference that they possessed MNPI, "much less that they consciously acted to exploit such information").

[129] Compl. ¶¶ 88, 163; *see* Defs.' Opening Br. Ex. 15; May 2017 Prospectus.

[130] Compl. ¶¶ 100, 163; *see* Q2 2017 Earnings Call.

[131] October 2017 Prospectus at 56.

[to] diminish[] the possibility that insiders could exploit outside market buyers."[132] Likewise, in *Tilden v. Cunningham*, the court declined to draw an inference of scienter where the defendants "engaged in trades shortly after the company engaged in a transaction or released financial information."[133]

Additionally, Crestview's June 9 and November 1, 2017 trades resulted from underwriters of the May and October 2017 offerings exercising their options to purchase additional shares within a set window.[134] There is no reasonable basis to infer that the timing of those trades was driven by Crestview.

Particularized facts—not speculation—must be pleaded to support a rational inference of scienter. None are provided in the Complaint. As a result, the plaintiffs have not met their burden of pleading that Marcus or Cassidy faces a substantial likelihood of liability under *Brophy* for Crestview's 2017 trades.

### 2. The Disclosure Claim

The plaintiffs also contend that demand is futile because a majority of the Demand Board faces a substantial likelihood of liability for making or approving false and misleading statements. "Whenever directors communicate publicly or directly with shareholders about the corporation's affairs, with or without a request

---

[132] 823 A.2d at 504.

[133] 2018 WL 5307706, at *20 (internal alterations omitted) (quoting *Guttman*, 823 A.2d at 503-04).

[134] Compl. ¶ 88; May 2017 Prospectus at 128-33; October 2017 Prospectus at 128-32.

for shareholder action, directors have a fiduciary duty to shareholders to exercise due care, good faith and loyalty."[135] Where the disclosures at issue do not request stockholder action, the "plaintiff must allege that the directors 'deliberately misinform[ed] shareholders about the business of the corporation, either directly or by a public statement.'"[136] Because the Company's charter has an exculpation provision, the plaintiffs must plead particularized allegations that "support the inference that the disclosure violation was made in bad faith, knowingly or intentionally."[137]

A determination of "whether the alleged misleading statements or omissions were made with knowledge or in bad faith requires an analysis of the state of mind of the individual director defendants."[138] Delaware courts infer scienter for such claims where a plaintiff pleads with particularity that directors "had knowledge that any disclosures or omissions were false or misleading or . . . acted in bad faith in not adequately informing themselves"[139] and were "'sufficient[ly] . . . involve[d] in the

---

[135] *Malone v. Brincat*, 722 A.2d 5, 10 (Del. 1998).

[136] *TrueCar*, 2020 WL 5816761, at *13 (quoting *Malone*, 722 A.2d at 14 (Del. 1998)); *see In re infoUSA, Inc. S'holders Litig.*, 953 A.2d 963, 990 (Del. Ch. 2007) ("When a Delaware corporation communicates with its shareholders, even in the absence of a request for shareholder action, shareholders are entitled to honest communication from directors, given with complete candor and in good faith.").

[137] *O'Reilly v. Transworld Healthcare, Inc.*, 745 A.2d 902, 915 (Del. Ch. 1999).

[138] *Citigroup*, 964 A.2d at 134.

[139] *Id.*

36

preparation of the disclosures' or that the director defendants 'were otherwise responsible for' the disclosures."[140]

Again, the bulk of the plaintiffs' allegations concern statements made by Lemonis. The plaintiffs' remaining allegations focus on directors who served on the Audit Committee during the relevant time period—Baltins, Cassidy, Schickli, George, and Kosick—for having "reviewed and approved the improper statements."[141] In particular, the plaintiffs contend that the Audit Committee reviewed and approved quarterly and annual SEC filings and the prepared remarks for quarterly earnings calls.[142]

Two groups of disclosures are at issue: (1) those about the Company's compliance with GAAP and internal controls, and (2) those regarding the Gander integration, anticipated store openings, and their effects on the Company's financial performance.[143] Despite having received a Section 220 production including Board minutes and materials, the plaintiffs have failed to demonstrate that Baltins, Cassidy, Marcus, Schickli, George, or Kosick face a substantial likelihood of liability for either set of disclosures.

---

[140] *TrueCar*, 2020 WL 5816761, at *13 (quoting *Citigroup*, 964 A.2d at 133 n.91, 134).

[141] Compl. ¶¶ 40, 64-65, 73, 76, 92, 105, 122, 132, 142.

[142] Id. ¶¶ 39-40. There are no allegations about Marcus's involvement in the disclosures that come close to meeting the particularity requirement. He was not a member of the Audit Committee.

[143] *Id.* ¶ 124; *see* Pls.' Answering Br. 34-39.

a. Disclosures about GAAP and Financial Controls

The first category of disclosures includes the Company's 2016 Form 10-K, Form 10-Qs for the first, second, and third quarters of 2017, and the prospectuses for the May and October 2017 secondary offerings.[144] The plaintiffs allege that the Audit Committee "reviewed and approved" the 2016 Form 10-K, despite the fact that it included overstated fourth quarter and year end results and falsely stated that the Company's "disclosure controls and procedures were effective" at the time.[145] The plaintiffs make similar allegations about the Audit Committee's approvals of the first, second, and third quarter 2017 Forms 10-Q, which stated that the Company's financials were prepared in accordance with GAAP and that it had effective internal controls.[146] The prospectuses made similar representations and incorporated the annual and quarterly SEC filings by reference.[147]

The Complaint lacks any well-pleaded facts from which the court could infer that the directors approved the public filings while knowing that they were materially false or misleading. On February 27, 2018—more than three months after the Company's Form 10-Q for the third quarter of 2017 was filed—the Company disclosed that certain accounting issues required revisions to the Company's fourth

---

[144] Compl. ¶¶ 66-69, 77-80, 86, 92-95, 101-02, 105-07.

[145] *Id.* ¶¶ 64, 69.

[146] *Id.* ¶¶ 76, 80, 92, 95, 107.

[147] *Id.* ¶¶ 86, 101-02.

quarter and year end 2016 financial statements and that material weaknesses in internal controls had been identified.[148] There are no particularized allegations indicating that the Board learned about this information until a February 22, 2018 Board meeting, where Wolfe discussed the need to make adjustments to the Company's financial statements.[149] The plaintiffs do not allege "what the directors knew and when" about the Company's accounting and internal control weaknesses before that.[150]

### b. Disclosures about Gander

The second category of alleged misstatements and omissions concerns the Gander integration. The plaintiffs cite to a plethora of allegedly false and misleading statements in various public filings, press releases, and earnings call transcripts that were reviewed and approved at Audit Committee meetings.[151] For some of the challenged statements, such as press releases about the Gander acquisition, the

---

[148] *Id.* ¶ 124.

[149] *Id.* ¶ 119. The plaintiffs also allege that on January 4, 2018, the Board was told about "recognition of revenue related to the Company's roadside assistance program"—one of the four areas of erroneous accounting. *Id.* ¶ 115. Even if the court inferred that the Board learned about the error at that meeting, it received the information months after the relevant disclosures were made. The plaintiffs further state that "Lemonis or the Company" should have disclosed the accounting error in the Company's January 4, 2018 press release. *Id.* ¶ 118. No Board involvement in that press release is alleged.

[150] *Citigroup*, 964 A.2d at 132-34 & n.88.

[151] *See* Compl. ¶¶ 74-122.

39

Complaint lacks any allegation of involvement by the outside directors.[152] Without particularized facts connecting the Board to the statements, the plaintiffs cannot establish a threat of director liability.[153]

For the disclosures where some director involvement is pleaded, the allegations in the Complaint largely follow a pattern. The plaintiffs allege that the Audit Committee met to review certain disclosures, that the Board also met and received information about Gander, and that disclosures were then issued that contradicted or concealed the information received by the Board.[154] By and large, the plaintiffs challenge Lemonis's statements—either quoted in press releases or made during earnings calls—that a certain number of Gander stores with a "clear path to profitability" were set to open and that the process was successful.[155] The plaintiffs' theory is that the Board either knew that the Company lacked a plan to open Gander stores on time or that the integration process was disastrous but withheld that information from the public.

The plaintiffs' claims center on two disclosures in particular. First, the plaintiffs critique the Company's February 27, 2018 press release announcing

---

[152] *E.g.*, Compl. ¶¶ 78, 82, 90, 117.

[153] *See Citigroup*, 964 A.2d at 133 n.88 ("Pleading that the director defendants 'caused' or 'caused or allowed' the Company to issue certain statements is not sufficient particularized pleading to excuse demand under Rule 23.1."); *see also Brehm*, 746 A.2d at 254.

[154] *E.g.*, Compl. ¶¶ 74-78, 92-97, 105-09.

[155] *See Id.* ¶¶ 61, 78, 81-82, 90, 96, 109, 128.

financial results for the fourth quarter and fiscal year 2017, which stated that the Company was "pleased with the early trends" for the "first Gander Outdoor stores opened in December 2017."[156] Second, they complain about an earnings call the same day, during which Lemonis stated that "[e]arly trends" in the first stores were "promising," that the Company was being "calculated and disciplined" in opening stores, and that the Company's "plan" was to "open nearly 72 Gander Outdoor stores by mid-June."[157] The plaintiffs assert that these statements, which had been approved in some form by the Audit Committee on February 23, 2018, were false because they did not disclose rising expenses due to integration problems or that the Company lacked a plan to open 72 stores as announced.[158]

No particularized facts are provided to support a reasonable inference that the Audit Committee members approved those disclosures, knowing that they were false, for many of the same reasons that the *Brophy* claims were found wanting. The increase in SG&A expenses due to Gander and its expected drag on the Company's adjusted EBITDA in the first half of the year were disclosed.[159] And there is no reason to conclude that the directors believed that the Company lacked a plan to open Gander stores despite approving disclosures indicating otherwise.

---

[156] *Id.* ¶ 123.

[157] *Id.* ¶ 128.

[158] *Id.* ¶ 129; Pls.' Answering Br. 36-37.

[159] Compl. ¶ 126; Q4 2017 Earnings Call.

The plaintiffs' allegations about the subsequent time period fare no better. According to the Complaint, the 2018 plans that the Board received on December 5, 2017 and January 4, 2018 contradicted the Company's disclosures about intended store openings.[160] Those plans stated that 60 stores were targeted to open in 2018 and provided a timeline for those openings. The Company's February 27, 2018 disclosures, by contrast, announced that as many as 72 stores would open by mid-June 2018 and described openings to date that were behind the timeline in the 2018 plans.[161]

Those facts cannot support an inference that the Audit Committee members knowingly and in bad faith issued disclosures overstating the number of store openings. To start, the figures in the 2018 plans are based on projections dated November 27, 2017.[162] The Company had also repeatedly announced that the number of stores was subject to change.[163] Moreover, there is no indication that the Audit Committee members believed that the difference between opening 60 and 72

---

[160] Compl. ¶¶ 114, 116; *see* 2018 Preliminary Plan; 2018 Plan.

[161] Compl. ¶ 129.

[162] 2018 Preliminary Plan at 19-20; 2018 Plan at 19-20; Compl. ¶¶ 114, 116. The plans are incorporated by reference into the Complaint. The plaintiffs argue that the Court should infer that the 2018 plans were final because there are no other plans in the record. But it would not be reasonable, given the multitude of disclosures about changes to the number of store openings, to infer that the numbers presented to the Board were set in store rather than management's best estimate as of November 27, 2017.

[163] *See* May 8, 2017 8-K at 1; May 2017 Prospectus at 6, 55; October 2017 Prospectus at 7, 34, 56-57.

Gander stores in 2018 would have a material effect on the Company's financial performance.[164]

More broadly, the plaintiffs maintain that the Board approved positive statements about the Gander integration without mentioning the setbacks in infrastructure, inventory management, logistics, and distributions systems that were, "in defendant Lemonis' words, a 'shit show.'"[165] Those problems were, according to the Complaint, "revealed" by Lemonis during an earnings call on May 8, 2018.[166] But the plaintiffs never indicate "what specifically the Company was obligated to disclose"[167] before then. There are no particularized allegations providing that the directors learned about major problems with the integration process sooner. The allegations about what the Board knew before the May 2018 earnings call are limited to vague updates about Gander inventory and integration issues.

In short, despite the numerous disclosures challenged, the plaintiffs fall short of demonstrating that any of the outside members of the Demand Board issued false

---

[164] *See Zimmer Biomet*, 2021 WL 3779155, at *13 ("The operative inquiry for the court is determining when a majority of the Demand Board both learned about the potentially problematic event 'and understood its significance to [the company's] financial performance.'" (quoting *TrueCar*, 2020 WL 5816761, at *14)).

[165] *E.g.*, Compl. ¶ 133.

[166] *Id.* ¶¶ 62, 143-50.

[167] *Citigroup*, 964 A.2d at 132-34.

and misleading disclosures "in bad faith, knowingly, or intentionally."[168]  I cannot conclude that Marcus, Baltins, Cassidy, Schickli, George, or Kosick face a substantial likelihood of liability for approving false and misleading disclosures.

### 3.    The *Caremark* Claim

The plaintiffs next argue that the members of the Demand Board face a substantial likelihood of liability for disregarding their oversight duties.  It is difficult to discern the grounds for that contention, given that the plaintiffs have attempted to plead *Brophy* and *Malone* claims on the same set of facts.  On one hand, the plaintiffs allege that the directors "ma[de] and approv[ed]" false and misleading disclosures after receiving "near real-time information about the Company's true financial health"[169] and that certain directors knowingly traded on MNPI.[170]  On the other hand, the plaintiffs' brief maintains that the Board "failed to make a good faith effort to monitor the affairs of the Company" and "stood by" as Lemonis "implemented his disastrous integration plan."[171]

---

[168] *Malone*, 722 A.2d at 14; *cf. infoUSA*, 953 A.2d at 990 (explaining that directors violate their fiduciary duties "where it can be shown that the directors involved issued their communication with the knowledge that it was deceptive or incomplete").

[169] Compl. ¶ 172.

[170] *Id.* ¶ 174.

[171] Pls.' Answering Br. 40; *see* Compl. ¶ 37 (alleging that "[t]he Individual Defendants . . . failed to prevent the other Individual Defendants from taking . . . illegal actions").

These theories of liability are fundamentally inconsistent, suggesting that the plaintiffs have generally failed to meet the stringent pleading requirements of Rule 23.1.[172] Given that the plaintiffs have attempted to raise a demand futility argument that would hypothetically affect a majority of the Demand Board, I will nonetheless address the plaintiffs' *Caremark*-like allegations for the sake of completeness.

Oversight liability "is possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment."[173] To prevail, the Complaint must allege particularized facts showing either that (1) "the directors utterly failed to implement any reporting or information system or controls" or that (2) "having implemented such a system or controls, [they] consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention."[174] Under either prong, "a showing of bad faith

---

[172] *See In re GoPro, Inc.*, 2020 WL 2036602, at *8 (Del. Ch. Apr. 28, 2020) ("Even if acceptable as a matter of alternative pleading, when the plaintiff struggles consistently to characterize the nature of the underlying wrongful conduct that gives rise to his claims, this imprecision signals that he may not have pled such conduct *with particularity*."). In *GoPro*, Vice Chancellor Slights similarly faced discordant theories of liability. There, the plaintiffs both argued that the defendants "caused" GoPro to issue false disclosures and also that the directors "consciously failed to monitor" the company's reporting systems that could have prevented those false statements. *Id.* at *9. He noted the incongruity in pleading that occurs when a plaintiff "characterizes the same set of underlying conduct as both a wrongful 'failure to act' *and* a wrongful 'affirmative decision.'" *Id.* at *8. The Complaint here suffers from the same inconsistencies.

[173] *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996).

[174] *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006).

conduct . . . is essential to establish director oversight liability."[175] "Only a sustained or systemic failure of the board to exercise oversight . . . will establish the lack of good faith that is a necessary condition to liability."[176]

The plaintiffs appear to have advanced a claim for failing to implement a proper reporting system.[177] "For directors to face liability under *Caremark*'s first prong, a plaintiff must show that the director made no good faith effort to ensure the company had in place any system of controls."[178] The Complaint not only lacks the sort of fact pleading that could support a *Caremark* "prong one" claim, but also contains numerous allegations that belie any inference that the directors committed a culpable failure of oversight.[179] For example, the Complaint describes twelve separate Board meetings from May 1, 2017 to February 22, 2018 where Gander-related topics were discussed.[180] The plaintiffs also acknowledge that the Audit

---

[175] *Id.*

[176] *Caremark*, 698 A.2d at 971.

[177] Pls.' Answering Br. 40-46 (arguing that the Board lacked a system of internal controls or monitoring). At times, the plaintiffs also assert that the Board took no "active steps regarding Lemonis's" plans for Gander "even as problems continued to arise." *Id.* at 46.

[178] *Sorenson*, 2021 WL 4593777, at *12 (internal quotation marks omitted) (quoting *Marchand v. Barnhill*, 212 A.3d 805, 822 (Del. 2019)).

[179] *See Zimmer Biomet*, 2021 WL 3779155, at *22 (remarking that allegations in the complaint detailing the board's oversight and receipt of information were "inconsistent" with a *Caremark* claim); *TrueCar*, 2020 WL 5816761, at *19 (holding that the plaintiffs could not state a claim under the first prong of *Caremark* where the complaint "acknowledged" the existence of reporting systems in place "to review and approve" public filings, "including an Audit Committee"); *see also Guttman*, 823 A.2d at 507.

[180] Compl. ¶¶ 77-121.

Committee consistently met to review and approve press releases, earnings call transcripts, and public filings.[181]

The plaintiffs' brief focuses primarily on the Board's purported lack of oversight before the Company placed a bid to buy Gander's assets out of bankruptcy.[182] According to the Complaint, the Board was first informed of the Company's bid on May 1, 2017—after the bid had been placed.[183] Even accepting that assertion as true, the bankruptcy court did not approve of the Company's bid and the Company's subsidiary did not enter into the asset purchase agreement until May 4, 2017 and May 5, 2017.[184] Proper oversight does not require that a board consider every corporate decision before it occurs.[185] There is no allegation that the bid, which totaled $38 million for Gander and Overton assets and would "complement" Camping World's offerings, required the Board's prior approval.[186]

---

[181] *E.g.*, Compl. ¶¶ 74, 76, 92, 96, 105.

[182] Pls.' Answering Br. 40-41.

[183] Compl. ¶ 77.

[184] May 2017 Form 8-K at 1.

[185] *See Caremark*, 698 A.2d at 968 ("Most of the decisions that a corporation, acting through its human agents, makes are, of course, not the subject of director attention."); *id.* at 971 ("The duty to act in good faith to be informed cannot be thought to require directors to possess detailed information about all aspects of the operation of the enterprise. Such a requirement would simply be inconsistent with the scale and scope of efficient organization size in this technological age.").

[186] Compl. ¶ 78; May 2017 Form 8-K at 1.

As a result, the plaintiffs have failed to demonstrate that any of the Demand Board members face a substantial likelihood of liability for a *Caremark* claim. Demand is not futile on that basis.

### 4. Director Independence

The plaintiffs' final demand futility argument is that Schickli and Baltins are not independent of Lemonis or Adams (assuming that Lemonis and Adams are interested).[187] No such arguments are raised as to Cassidy, George, Kosick, or Marcus. Accordingly, if either Schickli or Baltins are independent, a majority of the Demand Board will be deemed disinterested and independent and demand will not be excused.

"A lack of independence turns on whether the plaintiffs have pled facts from which the director's ability to act impartially on a matter important to the interested

---

[187] The plaintiffs also argue that Schickli is not independent from Crestview (and its director nominees Marcus and Cassidy) because he "co-invested" with Crestview in an entity at some point before 2005 and subsequently served as the CEO of that entity until 2013. Compl. ¶ 185. The plaintiffs also allege that George is a "former" Crestview Board designee. *Id.* ¶ 189. I have already concluded that the plaintiffs failed to show that Marcus and Cassidy face a substantial likelihood of liability for their *Brophy*, disclosure, or *Caremark* claims. Regardless, the allegations in the Complaint do not create a reasonable doubt about Schickli or George's independence from Crestview. The Complaint lacks any particularized allegations to contextualize Schickli's investment or to explain Crestview's involvement in (if any) in his former position. *See Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*, 119 A.3d 44, 60 (Del. Ch. 2015) (explaining that it was unreasonable to question the independence of a directors based on an employment relationship that ended three years before the action was filed). As to George, her former status as a Crestview designee cannot overcome the presumption of her independence. *See In re Dow Chem. Co. Deriv. Litig.*, 2010 WL 66769, at *9 (Del. Ch. Jan. 11, 2010).

party can be doubted because that director may feel either subject to the interested party's dominion or beholden to that interested party."[188]  The court must "consider all the particularized facts pled by the plaintiffs about the relationships between the director and the interested party in their totality and not in isolation from each other, and draw all reasonable inferences from the totality of those facts in favor of the plaintiffs."[189]

Schickli has served as a Camping World director since March 2016 and as a director of its subsidiary CWGS since 2011.  The plaintiffs assert that he lacks independence because he was designated to serve on the Board by Lemonis and Adams' entity ML Acquisition.[190]  The "mere fact that one was appointed by a[n alleged] controller" does not, however, overcome the presumption of director independence.[191]  The Company pays Schickli compensation of roughly $200,000 per year for his service as a director but the plaintiffs make no attempt to argue that compensation is material to him.[192]

---

[188] *Marchand*, 212 A.3d at 818 (internal quotation marks omitted).

[189] *Del. Cty. Empls. Ret. Fund v. Sanchez*, 124 A.3d 1017, 1019 (Del. 2015).

[190] Compl. ¶ 191; *see id.* ¶ 52.

[191] *Friedman v. Dolan*, 2015 WL 4040806, at *6 (Del. Ch. June 30, 2015); *see also Aronson v. Lewis*, 473 A.2d 805, 816 (Del. 1984) ("It is not enough to charge that a director was nominated by or elected at the behest of those controlling the outcome of a corporate election. That is the usual way a person becomes a corporate director.").

[192] Compl. ¶ 23; *see Robotti & Co., LLC v. Liddell*, 2010 WL 157474, at *15 (Del. Ch. Jan. 14, 2010) ("[D]irector compensation alone cannot create a reasonable basis to doubt a director's impartiality."); *In Oracle Corp. Deriv. Litig.*, 2018 WL 1381331, at *18 (Del.

49

The plaintiffs further allege that Schickli lacks independence from Lemonis and Adams because Schickli served as the Chief Operating Officer of Good Sam from 1993 to 1995.[193] Only Adams—and not Lemonis—is alleged to have controlled Good Sam when Schickli served in that role from 1993-1995.[194] Moreover, Schickli left Good Sam almost 25 years before the Complaint was filed, which cannot, by itself, "create a disabling interest" today.[195] "[T]he existence of a distant business relationship . . . is not sufficient to challenge . . . independence under our law."[196] The fact that Schickli served on the CWGS board and the Camping World Board alongside Adams and Lemonis for several years likewise cannot overcome the presumption of director independence.[197]

---

Ch. Mar. 19, 2018) (noting that "even this lucrative compensation [of $548,005] would form insufficient cause to doubt [a director's] impartiality" because "[t]here [we]re no allegations that the director compensation . . . is material to [the director]").

[193] Compl. ¶ 181.

[194] *Id.* ¶ 3.

[195] *Baiera*, 119 A.3d at 60.

[196] *In re MFW S'holders Litig.*, 67 A.3d 496, 514 (Del. Ch. 2013), *aff'd sub nom. Kahn v. M & F Worldwide Corp.*, 88 A.3d 635 (Del. 2014).

[197] *See Dow Chem.*, 2010 WL 66769, at *9 (noting that the fact directors at one company are "colleagues at another institution" or that one director played a role in nominating another director does not mean the directors cannot exercise their own business judgment when evaluating disputed transactions); *Friedman*, 2015 WL 4040806, at *6-7 (finding that directors were independent despite allegations of long-term board service and serving on boards of other controlled entities). The Complaint lacks any allegation of that could give rise to an inference of beholdeness. *Compare In re BGC P'rs, Inc.*, 2019 WL 4745121, at *12 (Del. Ch. Sept. 30, 2019) (noting that the case that the director lacked independence from the controlling shareholder was "bolstered by specifically alleged facts suggesting that these board appointments have been financially material" to the director

The plaintiffs' allegations about Baltins are similar, except that the plaintiffs also allege that Baltins lacks independence from Lemonis and Adams because a law firm where he is a partner previously received fees from Camping World.[198] But the question of Baltins's independence is an academic one that I ultimately need not answer. Given that I have already concluded that the plaintiffs have not pleaded particularized facts sufficient to create a reasonable doubt as to whether five of the nine Demand Board members could impartially consider a demand, my analysis ends here.

---

and that the controlling shareholder had "donated at least $65 million" to the university where the director served as provost); *In re Tesla Motors, Inc. S'holder Litig.*, 2018 WL 1560293, at \*17-18 (Del. Ch. Mar. 28, 2018) ("The Complaint's well-pled facts allow a reasonable inference that [the director] and [the controller] are acquainted beyond mere membership on the Board, as evidenced by [the controller] gifting to [the director] the first Tesla Model S and the second Tesla Model X ever made."); *Sanchez*, 124 A.3d at 1020 (noting that the director and the controller had been "close friends for more than five decades").

[198] Specifically, the plaintiffs allege that the firm received fees of $600,000 in 2017 and 2018. Compl. ¶ 184. In *In re Limited, Inc.*, the court held that a $400,000 payment to a director's business was insufficient to raise an inference that the director's judgment was tainted. 2002 WL 537692, at \*5 (Del. Ch. Mar. 27, 2002). In *In re infoUSA, Inc. Shareholder Litigation*, however, the court reached a different outcome given a $1.1 million payment in a single year to a firm where a director was a named partner. 953 A.2d at 974, 991-92. In my view, the facts alleged here fall closer to those in *Limited* than in *infoUSA*.

## III. CONCLUSION

The Complaint fails to plead particularized facts demonstrating that demand was futile as to a majority of the Demand Board members. The defendants' motion to dismiss is therefore granted and the Complaint is dismissed under Rule 23.1.